BEFORE THE UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE LONDON SILVER FIXING ANTITRUST AND COMMODITIES LITIGATION | MDL-2573 |

RESPONSE OF PLAINTIFF J. SCOTT NICHOLSON SUPPORTING
CENTRALIZATION OF THE LONDON SILVER FIX LITIGATION TO THE
SOUTHERN DISTRICT OF NEW YORK PURSUANT TO 28 U.S.C. § 1407

Pursuant to Judicial Panel on Multidistrict Litigation ("JPML") Rule 6.1(c), Plaintiff J. Scott Nicholson ("Nicholson") respectfully submits this response supporting centralization in the Southern District of New York ("Southern District") and opposing Plaintiff Eric Nalven's ("Nalven") Motion to Transfer and Centralization Under 28 U.S.C. 1407 ("Motion to Transfer") in the Eastern District of New York ("Eastern District").

I.  THE LONDON SILVER FIX LITIGATION

On July 25, 2014, Plaintiff J. Scott Nicholson ("Nicholson") filed the first complaint in the Southern District alleging that Defendants unlawfully and intentionally conspired to manipulate the price of physical silver and silver derivatives traded through the Manhattan-based Commodity Exchange Inc. ("COMEX") in violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et. seq.* and the Sherman Antitrust Act, 15 U.S.C. § 1, *et. seq. See Nicholson v. The Bank of Nova Scotia,* 1:14-cv-05682 (S.D.N.Y.) (the "Nicholson Action"). The Nicholson Action was assigned to the Honorable Denise L. Cote in the Southern District.

After Nicholson filed his Complaint, two other actions were filed in the Eastern District for what appear to be strategic; case leadership related reasons. *See Nalven v. The London Silver Market Fixing, Ltd.,* 14-cv-4724 (E.D.N.Y.) (Amon, C.J.) ("Nalven Action") and *American*

*Precious Metals, Ltd. v. The London Silver Market Fixing, Ltd.*, 14-cv-4724 (E.D.N.Y.) (Irizarry, J.) (collectively, with the Nicholson Action, the "London Silver Fix Litigation").

Nicholson initiated this litigation with his Complaint in the Southern District because that district has a substantial factual nexus to this litigation: it is where numerous unlawful acts took place and injuries occurred, where the COMEX is located, where a substantial number of class members and witnesses are located, where all of the Defendants have corporate offices, and where nearly all parties' counsel are located. Beyond this nexus to this litigation, the Southern District is home to many, if not all, of the of the benchmark rate manipulation cases filed in the United States. *See* Section II.A.1, *infra* at p. 6-7. This wealth of experience and knowledge in handling benchmark rate manipulation cases presents a strong likelihood that substantial efficiencies will occur by centralizing the London Silver Fix Litigation in the Southern District.

Moreover, there most certainly will be overlapping discovery between this case and the Gold Fix Litigation pending before the Honorable Valerie E. Caproni in the Southern District.[1] Indeed, before Nalven filed his Motion to Transfer, the Silver Defendants here sought to have the Nicholson Action transferred down the hall to Judge Caproni in an effort to coordinate discovery in these two benchmark rate manipulation actions. Countless efficiencies may be achieved by having the Silver and Gold Litigations coordinated in the same courthouse. Indeed, even Judge Cote's prompt ruling on Defendants' transfer request, after speaking with Judge Caproni, inherently demonstrates the ready, informal ease presented by the "down the hall" collaboration between Judge Cote and Judge Caproni. *See* Nicholson Action at Dkt. No. 7 (So Ordered Letter dated August 11, 2014.)

---

[1] *In re Commodity Exchange, Inc., Gold Futures and Options Trading Litig.*, MDL-2548 (S.D.N.Y.) (the "Gold Fix Litigation").

Nalven's decision to seek centralization in the Eastern District is curious, given that Nicholson filed first in the Southern District, the Gold Fix Litigation is pending in the Southern District, and Nalven filed his Gold Fix complaint in the Southern District and supported centralization there before the JPML.[2]

Nicholson is confident that centralized or coordinated pretrial proceedings of the London Silver Fix Litigation in the Southern District will promote efficiency and judicial economy and will eliminate the possibility of conflicting pretrial rulings. Centralizing the London Silver Fix Litigation to the Southern District where it started is also appropriate because: (1) the Southern District has considerable expertise in presiding over complex litigation matters involving commodities rate manipulation and antitrust; (2) there is an irrefutable factual nexus of the causes of action to Manhattan and where the COMEX is located; (3) the Southern District is a favorable docket to accept this matter; (4) the first-filed matter is currently pending in the Southern District; and (5) the Southern District is equally, if not more, convenient for travel by interested parties, witnesses and their counsel.

Nicholson supports centralization of the London Silver Fix Litigation. However, unlike Nalven, Nicholson respectfully requests that the JPML assign these related cases to the Southern District. The pendency of the Gold Fix Litigation in that courthouse presents a compelling opportunity for efficient coordination akin to other matters where innovation in that courthouse between cases has achieved streamlined, cost effective proceedings. Centralization in the Southern District will also promote the just, fair, and efficient progression of these actions in a district with the strongest domestic nexus to the unlawful conduct and injuries alleged in the

---

[2] *See* Gold Fix Litigation, MDL-2548 at Dkt. No. 1-1 at p. 6 (Nalven's Memorandum of Law in Support of Centralization in the Southern District of New York, filed on April 14, 2014).

Complaint. That centralization will help eliminate duplicative discovery, preventing inconsistent judicial rulings, and conserving both judicial and party resources.

## II. ARGUMENT

### A. The London Silver Fix Litigation Should Be Centralized In The Southern District Of New York

The JPML may centralize civil actions involving one or more common questions of fact pending in different districts upon determination that such transfer is for "the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407. The JPML may consider the site of common facts, cost and inconvenience, and the experience, skill, and caseloads of available judges. Manual for Complex Litigation (Fourth) § 20.131 (2004).

#### 1. The Southern District's Manhattan Courthouse is Located in the Financial Capital of the World And Routinely Handles Benchmark Rate Manipulation Cases

As noted above, the Southern District is the district of choice for benchmark rate manipulation cases. Unique here, all Defendants in this case identified certain overlapping aspects between this case and the Gold Fix Litigation when, on August 5, 2014, they unanimously sought to transfer this case from Judge Cote to Judge Caproni, who is presiding over the Gold Fix Litigation MDL. *See In re Commodity Exch.* (Gold Fix Litigation), 2014 U.S. Dist. LEXIS 113202, at *3. In their letter request to Judge Cote, Defendants stated that the London Silver Fix Litigation and the Gold Fix Litigation:

> are likely to raise overlapping legal and factual issues . . . . If the cases move past the pleading stage, there would likely be overlapping discovery issues, including the likelihood that many witnesses would testify in both actions.

4

*See* Nicholson Action at Dkt. No. 5 (Letter dated August 5, 2014 from Defendants' counsel to Judge Cote). Within just days Judge Cote consulted with Judge Caproni and ruled that the London Silver Fix Litigation would remain on her docket subject to any determination by the JPML. *Id.* at Dkt. No. 7. That coordinated, quick and efficient process attests to the efficiency and judicial economy that could occur by maintaining the London Silver Fix Litigation in the Southern District.

Moreover, Nalven's motion to transfer neglects the efficiencies that might be achieved (and judicial resources conserved) by the use of one shared magistrate within the Southern District. The 15 magistrate judges that sit in the Southern District often serve as discovery masters for the whole court, especially when multiple actions are coordinated. For example, the *In re Beacon Associates Litigation* involved multiple related securities and ERISA cases[3] pending in the Southern District before two different district judges (Judge Sand and Judge McMahon). Each case involved similar (but not identical) allegations of wrongdoing against some but not all of the same defendants relating to Madoff feeder funds. Recognizing the value of having joint coordinated discovery, the court assigned each of those three cases to a single Magistrate, Judge Andrew J. Peck, who coordinated pre-trial motions and presided over discovery disputes. If the London Silver Fix Litigation stays in the Southern District, the Court could appoint the same Magistrate Judge to oversee and coordinate the potentially large scale, cross-border discovery in both the London Silver Fix Litigation and the Gold Fix Litigation, thereby achieving the greatest level of efficiency and conserving judicial resources. Further, even if two different magistrate judges are ultimately assigned to the London Silver Fix and Gold

---

[3] *In re Jeanneret Associates, Inc.*, No. 09-cv-3907 (CM); *In re Beacon Associates Litigation*, 09-cv-0777 (LBS); *Board of Trustees of the Buffalo Laborers Security Plan et al.* v. *J.P. Jeanneret Associates, Inc.*, No. 09-cv-08362 (LBS).

5

Fix MDL cases, many efficiencies could still be achieved with those two colleagues sitting in the same courthouse.

Moreover, among its strengths, the Southern District is the appropriate forum for the London Silver Fix Litigation because of the District's sophistication and proximity to the heart of the financial industry:

> New York City, New York, is widely known as the nation's financial capital, if not that of the world. Investors throughout the country trade in markets operating out of New York. New York's interest in regulating these markets predominates because the financial industry is critical to its overall economic health and viability, as well as that of the nation.

*Expressjet Airlines, Inc. v. RBC Capital Mkts. Corp.*, 2009 U.S. Dist. LEXIS 64411 *37 (S.D. Tex. July 27, 2009).

When selecting a court, the JPML should consider the court's experience and familiarity with the types of issues presented. *See, e.g., In re "Factor VIII or IX Concentrate Blood Prods." Prods. Liab. Litig.*, 853 F. Supp. 454, 455 (J.P.M.L. 1993). As the JPML has noted, "the most comprehensive purported class actions have been commenced in the Southern District of New York." *In re Res. Exploration, Sec. Litig.*, 483 F. Supp. 817, 822 (J.P.M.L. 1980). The Southern District has considered many of the most complex antitrust and commodities MDL cases and managed them in a proficient and knowledgeable manner. *See, e.g., In re Libor-Based Financial Instruments Antitrust Litig.*, MDL-2262; *see also In re Commodity Exch., Inc., Silver Futures and Options Trading Litig.*, MDL-2213; *In re Bank of New York Mellon Corp. Foreign Exch. Transactions Litig.*, MDL-2335; *In re Currency Conversion Fee Antitrust Litig.*, MDL-1409.

The Southern District has been the go-to venue for all benchmark rate manipulation cases involving CEA and Antitrust claims similar to those present in the London Silver Fix Litigation. *See, e.g., In re Commodity Exchange, Inc., Gold Futures and Options Trading Litig.*, MDL No

6

2548 (S.D.N.Y.) (Gold Fix Litigation); *In re Libor-Based Financial Instruments Antitrust Litig.,* MDL-2262 (S.D.N.Y.); *see also In re Commodity Exch., Inc., Silver Futures and Options Trading Litig.,* MDL-2213 (S.D.N.Y.); *In re North Sea Brent Crude Oil Futures Litig.,* MDL-2475 (S.D.N.Y.); *Laydon v. Mizuho Bank, Ltd., et al.,* No. 12-cv-03419 (GBD) (S.D.N.Y.) (Euroyen Litigation); S*ullivan v. Barclays PLC et al.* , No. 13-cv-2811 (S.D.N.Y.) (Euribor Litigation) and *United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund v. Barclays Bank PLC et al.,* No. 14-cv-0350 (S.D.N.Y.) (FX Litigation). In addition, the Southern District regularly maintains a substantial number of CEA and antitrust commodity cases. *See, e.g., In re Amaranth Natural Gas Commodities Litig.,* No. 07-cv-6377(DC) (S.D.N.Y.); *In re Crude Oil Commodity Litig.,* 06-cv-6677(NRB) (S.D.N.Y.); *In re Natural Gas Commodity Litig.,* 03-cv-6186(VM) (S.D.N.Y.). This extensive list illustrates the Southern District's incomparable ability to handle the London Silver Fix Litigation.

### 2. The Southern District is the Epicenter of the Relevant Facts Alleged in the London Silver Fix Litigation and Where the COMEX is Located

When "[b]oth districts in which actions are pending are easily accessible, and a comparable number of actions are pending in each district," the JPML looks at where the defendants are located, where the parties, witnesses, and documents will be found, as well as the location's overall "nexus to the allegations." *In re Zoloft (Sertranline Hydrochloride) Prods. Liab. Litig.,* 856 F. Supp. 2d 1347, 1348 (J.P.M.L. 2012); *see also In re Credit Default Swaps Antitrust Litig.,* 976 F. Supp. 2d 1374, 1375 (J.P.M.L. 2013) (transferring case to the Southern District of New York because it "had a strong connection to th[e] litigation"); *In re Std. & Poor's Rating Agency Litig.,* 949 F. Supp. 2d 1360, 1362 (J.P.M.L. 2013) ("Southern District of New York . . . provides a convenient and accessible forum for this litigation. Importantly, S&P has its principal place of business in this district, and the witnesses and evidence relating to the

7

states' claims may be found there."); *In re Mun. Derivatives Antitrust Litig.*, 560 F. Supp. 2d 1386, 1387 (J.P.M.L. 2008) ("The alleged wrongful activities are intimately connected to the New York financial markets, many of the defendants are headquartered in New York City, the government investigation is ongoing in the Southern District of New York, and relevant documents and witnesses are likely to be found there.")

Here, it is indisputable that that the Southern District has a "strong connection" to this litigation. All of the Defendants are located and have corporate offices in Manhattan:

- **Wall Street:** Defendant Deutsche Bank AG is located at 60 Wall Street, New York, NY;

- **World Financial Center / Vesey Street:** Defendant The Bank of Nova Scotia is located at 250 Vesey Street, New York, NY; and

- **Fifth Avenue:** Defendant HSBC USA, N.A. is headquartered at 452 Fifth Avenue, New York, NY.

Defendants Deutsche Bank AG and the Bank of Nova Scotia operate their regional New York offices in the heart of the financial district, less than one mile away from the Southern District's courthouse. Similarly, Defendant HSBC Bank USA, N.A.'s is headquartered in Midtown on Fifth Avenue. Thus, all of the Defendants are located within a short distance to the Southern District courthouse. *See, e.g., In re Commodity Exch.* (Gold Fix Litigation), 2014 U.S. Dist. LEXIS 113202, at *3 (selecting the Southern District as the transferee court because "the domestic defendants all are located in that district."); *In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*, 775 F.Supp. 2d 1382 (J.P.M.L. 2011) (transferring action to the Southern District of New York because "[a] majority of the domestic defendants are located in that district, and thus many witnesses and discoverable documents are likely to be found there.");

*In re Elec. Books Antitrust Litig.*, 846 F. Supp. 2d 1378, 1380 (J.P.M.L. 2011) ("nearly all defendants, including all publishing defendants, are located in New York City, giving it a nexus to the allegations.")

Further, necessary witnesses and discovery documents will be located within Defendants' Manhattan offices, so consolidating the London Silver Fix Litigation in the Southern District would serve the highest degree of convenience for Defendants. *See In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*, 775 F. Supp. 2d at 1382 (action transferred to the Southern District because "many witnesses and discoverable documents are likely to be found there."); *In re Libor-Based Fin. Instruments Antitrust Litig.*, 802 F. Supp. 2d 1380, 1381 (J.P.M.L. 2011) (consolidating the action to the Southern District, partly because "[t]wo of the three United States-based defendants have their headquarters in that district"). Further, the Defendants' counsel all have offices located in the Southern District.

Here, as was the case in the *Gold Fix*, *Municipal Derivatives* and *Credit Default Swaps* litigations, each of the three London Silver Fix Litigation actions allege wrongful activities that "are intimately connected to the New York financial markets." *In re Mun. Derivatives Antitrust Litig.*, 560 F. Supp. 2d 1386, 1387 (J.P.M.L. 2008); *see also In re Credit Default Swaps Antitrust Litig.*, 976 F. Supp. 2d 1374, 1375 (J.P.M.L. 2013) (reasoning that "several events giving rise to the litigation occurred [in the Southern District of New York]"). Plaintiffs have alleged that Defendants unlawfully conspired to manipulate the price of silver during the class period, thereby causing considerable damage in Manhattan's financial district. Specifically, the injuries occurred on the trading floor of the COMEX, the primary market for trading metals (including silver), which is located in Manhattan's Financial District. *In re Commodity Exch.* (Gold Fix Litigation), 2014 U.S. Dist. LEXIS 113202, at *3 (ordering centralization in the Southern

9

District of New York reasoning that the "COMEX . . . is located in New York City."); *In re Mun. Derivatives Antitrust Litig.*, 560 F. Supp. 2d at 1387 ("We are persuaded that the center of gravity for this litigation is New York City"). For all of the foregoing reasons, the London Silver Fix Litigation has a strong nexus to the Southern District.

### 3. The Southern District Presents a Favorable Docket for the London Silver Fix Litigation

Nalven correctly reports that the Southern District has forty pending MDLs and the Eastern District has nine pending MDLs on its docket. However, Nalven neglects to consider that the number of District Judges in the Southern District is nearly *double* that of Eastern District (50 Southern District Judges versus 26 Eastern District Judges). Moreover, nearly half (24) of the District Judges in the Southern District do not currently have MDLs pending on their dockets, providing the JPML with a large assortment of available and experienced jurists to manage the London Silver Fix Litigation.

Beyond the numbers, the presence of the Gold Fix Litigation on the Southern District's docket will create enumerable efficiencies. As noted above, all of the Defendants recognized the efficiencies created in the Southern District when they jointly sought to have the Nicholson Action transferred from Judge Cote to Judge Caproni. Yet, Nalven ignores these efficiencies and argues, instead, that Judge Cote, who is a well-respected Senior District Judge, is not an appropriate transferee court because she already has two MDL proceedings[4] pending on her docket.[5] This argument is unpersuasive for several reasons. First, Judge Cote already indicated that the London Silver Fix Litigation can remain on her docket:

---

[4] *In re Electronic Books Antitrust Litig.*, MDL No. 2293 and *In re Credit Default Swaps Antitrust Litig.*, MDL No. 2476.

[5] Nalven's Memorandum of Law in Support of Motion for Centralization, Dkt. No. 1-1 at p. 5, n.9.

> Having consulted with Judge Caproni, this litigation will remain before this Court, subject to any determination by the JPML.

*See* Nicholson Action, Order at Dkt. No. 7. Second, Nalven fails to consider that in one of the MDL cases assigned to Judge Cote (*In re Electronic Books Antitrust Litig.*), several defendants have already reached settlements and Judge Cote recently approved a preliminary settlement of the class action against defendant Apple, Inc. *See In re Elec. Books Antitrust Litig.*, 2014 U.S. Dist. LEXIS 106260, at *39 (S.D.N.Y. Aug. 1, 2014). Thus, it is possible that Judge Cote will soon only have one MDL case on her docket. Finally, it is common in the Southern District for judges to handle two or three MDL proceedings on their docket.[6] If the JPML centralizes the London Silver Fix Litigation in the Southern District, either Judge Cote, Judge Caproni or any of the numerous other well-qualified jurists have the docket capacity to competently preside over this litigation.

### 4. The First-Filed Silver Action is Pending in the Southern District

Nicholson filed the first London Silver Fix litigation action on July 25, 2014, making the Southern District an appropriate forum in which to centralize the London Silver Fix Litigation. The JPML has centralized pretrial proceedings in the district where the first-filed action was pending. *See In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*, 775 F.Supp. 2d at 1382 (transferring to the Southern District of New York, noting among other reasons it had the first-filed case); *In re Zoloft (Sertranline Hydrochloride) Prods. Liab. Litig.*, 856 F. Supp. 2d 1347, 1348 (J.P.M.L. 2012) (transferring to the Eastern District of Pennsylvania, partly because the first-filed action was pending there); *see also In re Mattel, Inc.*, 528 F. Supp. 2d 1367

---

[6] *See* http://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-August-15-2014.pdf (last visited on August 27, 2014). This chart shows that at least three Senior District Judges in the Southern District (Judges Griesa, Marrero, and Sweet) are currently maintaining three MDL proceedings on their dockets. *Id.* at p.4. In addition, seven district judges in the Southern District currently preside over two MDL proceedings. *Id.*

(J.P.M.L. 2007) (transferring to the Central District of California where the first-filed action was pending); *In re Lending Tree, LLC, Customer Data Sec. Litig.*, 581 F. Supp. 2d 1367 (J.P.M.L. 2008) (consolidating proceedings to the Western District of North Carolina where the first-filed action was pending). Here, the Nicholson Action was the first filed of the three actions, selecting the Southern District based on its aforementioned supremacy and nexus to the unlawful acts and resulting injuries; therefore, the JPML should transfer the consolidated action to the Southern District.

### 5. The Southern District is an Equally Convenient Forum

Further, the Southern District is equally, if not more, convenient to New York's major transportation hubs. The Southern District's Manhattan courthouse is located in downtown Manhattan, easily accessible on foot from the Financial District or via subway from any of the outer boroughs. In addition, both Grand Central Station and Pennsylvania Station are located nearby the Southern District's Manhattan courthouse. LaGuardia Airport, John F. Kennedy International Airport, and Newark Liberty International Airport are a short drive away, or easily accessible by train from Manhattan making the Southern District the ideal forum for this litigation involving a conspiracy with London witnesses and evidence. *Accord, e.g., In Re: Libor-Based Financial Instruments Antitrust Litig.*, 802 F.Supp. 2d 1380, 1381 (J.P.M.L. 2011); *In re Air Crash at Belle Harbor*, 203 F. Supp. 2d 1379, 1380-81 (J.P.M.L. 2002) ("the Southern District of New York courthouse in Manhattan provides a convenient and accessible forum for participants in the coordinated or consolidated pretrial proceedings"). The Southern District is an ideal forum for a complex, multidistrict action, since "litigation of this scope will benefit from centralization in a major metropolitan center that is well served by major airlines, provides ample hotel and office accommodations, and offers a well-developed support system for legal services."

*In re WorldCom, Inc. Sec. & "Erisa" Litig.*, 226 F. Supp. 2d 1352, 1355 (J.P.M.L. 2002) (centralization in Southern District of New York).

Moreover, all of the Defendants and their counsel have offices located in Manhattan. Thus, many of the witnesses will likely be meeting their counsel at Defendants' or their counsels' offices located in the Southern District. Thus, centralizing the London Silver Fix Litigation in the Eastern District would, therefore, only increase the traveling expenses of witnesses and their counsel.

### III.  CONCLUSION

For the abovementioned reasons, Plaintiff J. Scott Nicholson respectfully submits that the London Silver Fix Litigation should be centralized in the Southern District for pre-trial proceedings.

Dated: August 27, 2014

>Respectfully submitted,
>
>**LOWEY DANNENBERG COHEN & HART, P.C.**
>
>By:    /s/ *Vincent Briganti*
>Barbara J. Hart
>Vincent Briganti
>Scott V. Papp
>One North Broadway, 5th Floor
>White Plains, New York 10601
>Tel.:   914-997-0500
>Fax:   914-997-0035
>bhart@lowey.com
>vbriganti@lowey.com
>spapp@lowey.com
>
>*Counsel for Plaintiff J. Scott Nicholson and the Proposed Class*

13